EDMUND L. MUNSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 75078.  Promulgated January 28, 1938.

*Newton K. Fox, Esq.*, and *Adrian C. Humphreys, Esq.*, for the petitioner.

*Willis R. Lansford, Esq.*, for the respondent.

## OPINION.

TYSON: The respondent has determined an income tax deficiency in the amount of $2,577.75 for the calendar year 1930 and the petitioner claims that he has made an overpayment of income tax for that year in the amount of $11,363.02.

Petitioner assigns as error (1) the inclusion of $108,250 in income for the year 1930, and alleges that such amount constituted petitioner's distributive share of certain partnership profits for the year 1928 resulting from the sale or exchange of a New York Stock Exchange seat or membership constituting a capital asset of the partnership, and thus income to the petitioner taxable for the year 1928, whether distributed or not in that year; (2) in the alternative, the failure to tax such alleged profit as a capital net gain to petitioner in 1930; and (3) the failure to allow as a deduction for 1930 a claimed loss of $4,500 on account of certain stock alleged to have become worthless in 1930.

1–2. The petitioner is an individual, residing in Mt. Kisco, New York, and from 1915 to December 31, 1928, he was a bond and stock broker.

In or about 1924 Joseph M. Adrian, Jr., acquired a seat or membership in the New York Stock Exchange. On July 1, 1925, Adrian and the petitioner entered into the following written agreement:

AGREEMENT made this first day of July, 1925, between Edmund L. Munson of Mount Kisco, New York, party of the first part, and Joseph M. Adrian, Jr., of Brewster, New York, party of the second part, witnesseth:

First:—The parties hereto agree to engage as co-partners for the transaction of the business of brokers and dealers in stocks, bonds and other securities, under the firm name of Munson & Adrian, and all profits and losses shall be apportioned equally between them.

Second:—Either of the parties hereto may terminate this agreement by giving ten days notice in writing to the other party.

Third:—The New York Stock Exchange membership of the party of the second part shall be carried on the firm books at a cost value of Ninety Six Thousand ($96,000.) Dollars. In the event of a dissolution of the copartnership, whether by act of the parties or by operation of law, the said membership shall be sold or retained by the said party of the second part, at his option. In the event that it is sold, the difference between the sale price and the cost value shall be charged or credited as loss or gain to the parties hereto in equal portions. In the event that it is retained, its liquidating value shall be fixed at a price which shall be midway between the price of the last preceeding and the next succeeding sale of other memberships, and in like manner the difference shall be charged or credited as loss or gain. Should the liquidating value as specified in the latter case, show a substantial profit, the party of the second part may discharge his obligation to the party of the first part, in the following manner: Ten Thousand ($10,000.) Dollars to be paid upon the liquidation of the partnership, the balance in annual installments of Ten Thousand ($10,000.) Dollars each, with interest at the legal rate until the entire amount shall be paid, except that should the party of the second part sell the said membership the entire unpaid balance shall become due and payable upon receipt of the sale price by the party of the second part. At the option of the party of the first part, the party of the second part, shall if possible to do so, obtain a bond in favor of the party of the first part, or secure the obligation in some other way, so that the said party of the first part may have the immediate use of the money.

Fourth:—The parties hereto agree that upon the dissolution of the co-partnership, in whatever manner accomplished, no estimate shall be placed upon and nothing shall be paid or allowed either party for any alleged or real good will of the firm. Furniture, fixtures and all other chattels which are the property of the firm are considered to have no value and in the event of dissolution by death, they shall be the absolute property of the surviving partner.

Fifth:—This agreement shall bind the representatives, executors, administrators and assigns of the parties hereto.

The intention of petitioner and Adrian under their agreement to form a partnership was that they would engage in the business of brokers and dealers in securities and divide equally the profits and losses from such business. It was necessary for the partnership to have the use of a membership in the New York Stock Exchange if it were to receive the full commissions on its transactions, for if it did

not have such use and dealt through a member of the Stock Exchange who was not a partner it would have been required to split its commissions. Under the rules of the Stock Exchange, membership in that Exchange could not be held in the name of a partnership, but must be held in the name of an individual. Adrian contributed the use of his membership in the Stock Exchange, which had cost him $96,000, was valued at the same amount on July 1, 1925, and was set up in that amount in the capital account of Adrian on the partnership books. Also, capital was necessary to enable the partnership to carry margin accounts. Petitioner contributed to the partnership $50,000 cash, plus certain securities which were set up in the capital account of petitioner on the partnership books on July 1, 1925, and his capital contributions were thereafter increased to the extent that by 1928 his total contributions amounted to $100,000. Also, petitioner brought to the partnership of Munson & Adrian former customers of his who constituted about 98 percent of all the firm's customers in July 1925.

To comply with the requisites of a ruling of the New York Stock Exchange, petitioner and Adrian entered into the following supplemental agreement:

AGREEMENT made this first day of November, 1927, between Edmund L. Munson of Mount Kisco, New York, party of the first part, and Joseph M. Adrian, Jr., of Brewster, New York, party of the second part, witnesseth:

First:—This agreement is supplemental to an agreement made the first day of July, 1925, between the parties hereto, and confirms the said agreement except as hereinafter provided.

Second:—The party of the second part, by contributing the use of his membership in the New York Stock Exchange, hereby expressly agrees that in so far as it is necessary for the protection of the creditors of said partnership said membership shall be an asset of said partnership.

On June 12, 1928, petitioner and Adrian entered into the following agreement for dissolution of the partnership of Munson & Adrian on June 30, 1928:

AGREEMENT made this 12th. day of June 1928 between Edmund L. Munson of Mount Kisco, New York, party of the first part, and Joseph M. Adrian Jr. of New York City, party of the second part, witnesseth:

First:—The parties hereto agree that a certain agreement of copartnership made between them bearing date the first day of July 1925, and a supplemental agreement bearing date November 1st. 1927, shall terminate at the end of business on June 30th. 1928, and said contracts shall be of no force and effect thereafter.

Second:—With reference to the New York Stock Exchange membership of the party of the second part, the liquidating value, referred to in paragraph third of the Partnership Agreement dated July 1st. 1925, shall be fixed at a price which is the equivalent of a sum midway between the price of the last sale of a membership prior to June 6th. 1928 and the last sale prior to July 1st. 1928, except in the event that there be no sale between and including June

6th. 1928 and including June 30th. 1928, the price of the next sale subsequent to June 30th. 1928 shall be used in computing said liquidating value.

Third:—The party of the second part acknowledges his personal indebtedness to the party of the first part in a sum which is fifty per centum (50%) of the difference between Ninety-six Thousand Dollars ($96,000.00) and the liquidating value of the New York Stock Exchange membership as it shall be fixed in accordance with the provisions of paragraph second of this agreement.

Fourth:—The party of the second part shall pay and satisfy the said indebtedness in the following manner: On July 1st. 1928 the sum of Ten Thousand Dollars (10,000.00), and annually thereafter on each succeeding July 1st. the sum of Ten Thousand Dollars ($10,000.00) with interest at six per centum (6%) on the unpaid balance on each date of payment.

At the option of the party of the first part, the party of the second part shall, if possible to do so, obtain a bond in favor of the party of the first part, or secure the obligation in some other way, so that the party of the first part may have the immediate use of the money.

Fifth:—This agreement shall bind the representatives, executors, administrators and assigns of the parties hereto.

By this agreement of June 12, 1928, Adrian elected to exercise his option under the agreement of July 1, 1925, of retaining the New York Stock Exchange membership, which had remained standing in his name, and its "liquidating value" was determined by the sale price of other Stock Exchange memberships. The petitioner's one-half of the increment in value of the Stock Exchange membership amounted to $130,750, and, pursuant to Adrian's acknowledgment of his personal indebtedness to petitioner therefor, Adrian paid to petitioner the sum of $10,000 in each of the years 1928 and 1929 and the sum of $110,750 in 1930.

In his 1928 income tax return, made on a cash basis, petitioner included his share of the profits from the operations of the partnership, exclusive of any profit on the Exchange membership, up to July 1, 1928, but he did not include therein the $10,000 received from Adrian in 1928, upon advice of counsel that his profit on the Stock Exchange membership was not taxable until he received the total amount of $130,750 due him from Adrian. After an investigation by a revenue agent the said amount of $10,000 was held to be income to petitioner in 1928, and an additional tax of $1,745.59 was asserted, and on June 28, 1930, the petitioner signed a waiver of the right to appeal to this Board and a consent to assessment and collection of that deficiency.

In his 1929 income tax return, made on a cash basis, petitioner included therein as taxable income the amount of $10,000 paid to him by Adrian in that year, because of the ruling by the revenue agent for the year 1928.

In 1930 petitioner received $110,750 from Adrian under the agreement of June 12, 1928, and in his return for that year, made on a cash basis, he included therein such amount less $2,500 counsel fees paid

in 1930, or $108,250 as a capital gain taxable at 12½ percent. Attached to his return for 1930 was the following statement:

In settling the affairs of Munson & Adrian, members of the N. Y. Stock Exchange, the profit or loss on the Seat was to be divided equally between the two partners. There was a profit of $261,500.00 fixed by the Arbitration Committee of the Exchange. My share of the profit was $130,750 less counsel fees of $2,500.00. In 1928 I received $10,000.00 and in 1929 $10,000.00 as shown in my tax return for those years. The remaining $110,750.00 I am reporting in this return. Counsel fees of $2,500.00 were paid by me on December 1st, 1930.

For the year 1930 petitioner reported a tax due in the sum of $10,235.16, which he paid in four installments of $2,558.79 each on March 13, June 13, September 10, and December 7 of 1931. On January 19, 1933, petitioner paid an additional income tax of $1,020.69 plus interest or a total of $1,127.86 for the year 1930. On February 16, 1933, petitioner executed a waiver of the statute of limitations, which was signed by the Commissioner of Internal Revenue on February 25, 1933. On July 14, 1933, the petitioner filed a claim for refund of taxes paid for the year 1930, in the sum of $11,363.02, based upon his contention that he erroneously reported the amount of $108,250 as income for 1930 because it represented his distributive share in 1928 of the partnership profit in that year on the Stock Exchange membership and was taxable income to him in 1928, whether distributed or not. That claim for refund was disallowed by the respondent on January 25, 1934. The petition initiating this proceeding was filed on March 12, 1934.

In asserting the deficiency in controversy the respondent determined the amount of $108,250 received by petitioner in 1930 was taxable in that year as ordinary income, subject to normal and surtax.

Upon organization of the partnership of Munson & Adrian in 1925, the petitioner contributed cash and securities and Adrian contributed the use of his membership on the New York Stock Exchange at an agreed value of $96,000, as their respective capital accounts. Adrian could not, under rules of the Stock Exchange, actually transfer the membership to the name of the partnership.

The various revenue acts since that of 1918, while not recognizing a partnership as a taxable entity, have recognized it for certain purposes. Under the Revenue Act of 1928, as under earlier acts, a partnership is required to make a return showing specifically *its* items of gross income and the deductions allowed by law (sec. 189). *Its* net income must be computed in the same manner and upon the same basis as in the case of an individual (sec. 183), but instead of a tax being imposed upon the partnership, each partner in his individual capacity is made liable for the income tax on his distributive share, whether distributed or not, of the partnership's net income (secs. 181, 182). Thus, in the instant case, *if*, as contended by the petitioner,

the partnership was the legal or beneficial owner of the Exchange membership as a capital asset and sold it to Adrian in June 1928, at a net profit of approximately $261,500, such profit would have constituted income to the partnership taxable to the individual partners in 1928, whether distributed or not, on the basis of their distributive shares of 50 percent each. *W. C. Langley & Co.*, 2 B. T. A. 199; *Logan & Bryan*, 4 B. T. A. 12. Conversely, *if*, as contended by respondent, the Exchange membership never became a partnership asset, either legally or equitably, but remained the property of Adrian, individually, who by contract created a personal obligation to pay to petitioner, individually, one-half of the increment in the value of the Exchange membership during the existence of the partnership and collateral to the partnership agreement, then such increment in value would constitute not a partnership gain, but income to petitioner, individually, when realized by his receipt of cash or the equivalent.

Upon consideration of the written agreements of Adrian and the petitioner and the testimony and exhibits in this proceeding, we conclude that the partnership did not acquire Adrian's Exchange membership as an asset, but secured solely the use thereof during the period of its existence.

The agreement of July 1, 1925, provided for the organization of the partnership, a division of all profits and losses equally, and the termination of the partnership upon 10 days notice by either party. That written agreement made no specific provision for a capital contribution by petitioner. As to the Exchange membership, that agreement provided, inter alia, that it should be carried on the firm's books at a cost value of $96,000, but that in the event of dissolution such "membership shall be *sold or retained by*" Adrian "*at his option*"; that if sold the gain or loss was to be apportioned equally between Adrian and petitioner; and that if retained by Adrian and the liquidating value "show a substantial profit" Adrian "may *discharge his obligation* to*" petitioner by annual payments of $10,000 plus interest. Under that agreement the partnership acquired no degree of ownership in the Exchange membership itself, but had merely the right to the use thereof during the existence of the partnership, and upon its dissolution this right ceased to exist. Neither the partnership nor petitioner could have made any disposition of the membership or the right to the use thereof or any interest therein. Under the agreement of July 1, 1925, and only upon the termination of the partnership Adrian *alone* had the right to sell or to retain the Exchange membership and simultaneously and as a necessary concomitant there arose Adrian's individual and personal obligation to pay to the petitioner, individually, one-half of the profit (over

$96,000) if he, Adrian, sold the membership, or, an amount equal to one-half of the membership's increment in value (over $96,000) if he, Adrian, retained the membership. Likewise, petitioner's obligation to Adrian for one-half of any loss upon the membership, upon dissolution of the partnership, was a personal obligation to Adrian and not to the partnership.

The supplemental agreement of November 1, 1927, providing that the Exchange membership should be a partnership asset "in so far as it is necessary for the protection of the creditors of said partnership" was entered into only to comply with the requisites of a ruling of the New York Stock Exchange and did not cause Adrian's membership to become a general asset of the partnership for all purposes and, also, it is a clear indication that the agreement of July 1, 1925, did not embrace the Exchange membership as an asset of the partnership.

In the agreement of June 12, 1928, terminating the partnership, and in pursuance of the provisions of the agreement of July 1, 1925, Adrian, having retained his Exchange membership, acknowledged "his personal indebtedness" to petitioner in a sum equal to 50 percent of the then value of the membership in excess of $96,000 and agreed to "pay and satisfy the said indebtedness in the following manner": $10,000 on July 1, 1928, and $10,000 annually on each succeeding July 1, with interest at 6 percent.

It is clear that the partnership made no sale or disposition of Adrian's Exchange membership in June 1928 and realized no gain therefrom in that year which would be taxable to the partners, whether distributed or not. Furthermore, the partnership apparently did not consider that it had realized a gain from any transaction involving Adrian's Exchange membership, for in its return for 1928 it did not report any income from such a source distributable to the partners. The instant case is clearly distinguished from *W. C. Langley & Co.*, *supra*, and *Logan & Bryan*, *supra*, on the facts in that in those cases the Board specifically found as a fact that the Exchange memberships involved in certain transactions were the property and assets of the partnerships, while here it is found that Adrian's Exchange membership did not become the property or asset of the partnership of Munson & Adrian.

In the instant case we conclude that the income in controversy arose out of the performance of an agreement between Adrian and the petitioner, as individuals, and bore no relation to the partnership, its income for 1928, or its dissolution, except that upon the happening of the latter event Adrian's personal indebtedness to petitioner became established and determinable in a definite amount. We further conclude that under Adrian's contract obligation to petitioner the deferred payments constituted ordinary income to him in the respec-

tive years in which he received them in cash, for it was only in such years that he actually realized the gain pursuant to the terms and the performance of that obligation. Accordingly, we sustain the respondent's determination that the amount of $108,250 received by petitioner in 1930 constituted ordinary income in that year.

3. In 1925 or 1926 petitioner purchased a number of shares of stock of the Wild Elk Conservation Range of Montana and his total investment therein amounted to $4,500. That corporation purchased, at 50 cents an acre, 114 acres of land near Martinsdale, Montana, and 100 or more head of elk at $30 or $40 a head, and engaged in the business of breeding elk for sale in the market.

On July 6, 1928, petitioner visited the elk range and found that approximately half of the herd of elk had starved to death and the balance of the herd was starving because the 114 acres of land had been entirely denuded of grass and the elk were being fed with oats. Petitioner thereupon furnished the sum of $1,500 for the purchase of a carload of wire and the stringing of a fence to enclose additional pasture land for the elk, with the expectation that the remaining elk would multiply sufficiently to make their offspring marketable. However, that expectation did not materialize. Between the time of his visit in 1928 and up to 1930 petitioner received, from people in the vicinity of the range, reports as to the operations on the elk range and also a report that the authorities had cut the fences and turned the starving elk loose to roam at large.

In 1930 Barnes, a stockholder, invested $3,500 additional in an effort to sell additional stock and revive the venture, but without success. In that year the corporation's 114 acres of land had a value of about $50 and could not have been sold for enough to pay the two or three years' unpaid taxes. In 1930 the promoter of the elk range visited petitioner and advised him that the venture was hopeless. Also, in 1930, the petitioner's attorney investigated the matter and reported to petitioner that his stock in the Wild Elk Conservation Range of Montana was worthless.

The record does not establish the year in which the elk were turned loose to roam at large, but it was apparently at some time between 1928 and 1930, and petitioner testified that he did not believe that his shares of stock had any value after the happening of that event. Further, petitioner testified that the stock was "losing value right along" for some time and became worthless "in the latter part of '29 or '30 or summer of '29."

In his income tax return for 1930 the petitioner deducted the amount of $4,500 as a loss sustained on his investment in stock of the Wild Elk Conservation Range of Montana. Respondent disallowed the deduction on the ground that the stock did not become worthless in 1930.

A deduction for a loss may be allowed only in the year in which the loss is *actually sustained* and a loss on account of stock becoming worthless is *sustained* only in the year in which the stock actually became worthless. *Forbes* v. *Commissioner*, 62 Fed. (2d) 571. Upon this record we are unable to determine as a fact the year in which petitioner's shares of the above mentioned stock actually became worthless. Accordingly, upon failure of proof on this issue, the respondent's disallowance of the claimed loss deduction of $4,500 is sustained.

*Decision will be entered for respondent.*